## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) | |
| **National Veterans Legal** | ) | |
| **Services Program**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil No. 14-cv-01915 (APM)** |
| | ) | |
| **United States Department of Defense**, *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## MEMORANDUM OPINION[1]

### I.      INTRODUCTION

Four Plaintiffs—two veterans services organizations and two Army veterans—filed this action to challenge various practices of the Army Board for Corrections of Military Records ("ABCMR" or "the Board"). The ABCMR is a civilian board whose members are appointed by the Secretary of the Army and tasked with the responsibility of reviewing applications submitted by servicemen and women for correction of military records. At least three Board members must review applications that are properly before the Board and determine whether to correct a military record on the ground that an error or injustice exists.

The ABCMR Board members do not, however, operate alone. They have a staff, which assists the Board with receiving, processing, and reviewing applications. Plaintiffs' primary challenge in this case concerns how the ABCMR uses its staff. They contend that the Board has unlawfully delegated to its staff the authority to review and return applications for lack of adequate

_____

[1] The court apologizes to the parties for the length of time it has taken to issue this decision.

documentation, in this case medical records.  Plaintiffs contend that such discretionary tasks must be performed by a Board member only.

Plaintiffs also challenge two other Board practices.  They contend that the ABCMR impermissibly requires applicants—specifically here, the two individual plaintiffs—to acquire the medical records needed to complete their applications.  Plaintiffs argue that the Board—rather than the applicants—bears that responsibility, but has failed to fulfill it.  Additionally, Plaintiffs contend that the ABCMR has failed to make public two internal guidance documents, known as the "Screening Team Analyst Resource" and the "Handbook for ABCMR Board Members," which set forth rules and policies concerning the approval and denial of applications.

Before the court is Defendants' Motion to Dismiss the Complaint.  For the reasons described below, the court grants Defendants' Motion in its entirety.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   *Plaintiffs*

Plaintiff National Veterans Legal Services Program ("NVLSP") is a "not-for-profit organization that aims to ensure that the nation's 25 million veterans and active duty personnel receive the benefits to which they are entitled because of disabilities resulting from their military service to our country . . . by providing and helping to facilitate the free-of-charge representation of veterans in proceedings before the military review boards, military administrative discharge boards, military medical and physical disability evaluation boards."  Complaint, ECF No. 1 [hereinafter Compl.], ¶ 15.  Since 2007, NVLSP has operated a nationwide program called "Lawyers Service Warriors" through which it screens and assigns matters to volunteer attorneys from private law firms and corporate legal departments to represent veterans regarding, among

other things, their applications to the ABCMR. *Id.* ¶ 16. NVLSP claims that it devotes resources to investigating "the unpublished rules, guidelines and practices under which the ABCMR operates in adjudicating applications," including the circumstances under which ABCMR applications are returned to applicants for additional information. *Id.*[2]

The individual plaintiffs are two Army veterans. Plaintiff Angelo Duran was deployed in Iraq from August 8, 2006, to October 21, 2007. *Id.* ¶¶ 39-40. On April 21, 2013, Duran was honorably discharged for "completion of required active service." *Id.* ¶ 52. On April 30, 2013, Duran applied to the ABCMR to change his records to instead reflect a medical discharge. According to the Complaint, a medical retirement would have "entitled Duran to receive significant military disability retirement benefits and military health care for him, his spouse, and his children that his current discharge status makes him ineligible to receive." *Id.* ¶ 53. Duran alleges that he submitted copies of "numerous" Army medical records to substantiate that, at the time of his discharge, he suffered from post-traumatic stress disorder. *Id.*

In a letter dated May 22, 2013, signed by Klaus Schumann, the ABCMR's Chief of its Case Management Division, the ABCMR informed Duran that, in order for the ABCMR to consider his application, he would "need to provide all Army medical treatment records that w[ould] substantiate" his request and that the ABCMR "cannot process [his] application without the aforementioned documents." Compl., Ex. A, Letter from Schumann to Duran (May 22, 2013) [hereinafter Duran Letter], ECF No. 1-1. The letter further stated that the ABCMR staff had "file[d] [his] application without action and without prejudice," and that Duran could reapply for

---

[2] The other named Plaintiff, Vietnam Veterans of America, "has been unable to identify a specific member who is willing to be identified in connection with this litigation at this time." Mem. in Opp'n to Mot. to Dismiss, ECF No. 19 [hereinafter Pls.' Opp'n], at 16 n. 8. Accordingly, the court grants the organization's request to be dismissed without prejudice.

ABCMR consideration with the necessary documentation.  *Id.*  The letter enclosed a blank application form for his convenience.  *Id.*

Plaintiff Scott Fink is an Army National Guard veteran who served in Iraq from January 4, 2005, to June 2, 2006.  *Id.* ¶¶ 56-57.  Fink was diagnosed with service-connected post-traumatic stress disorder.  *Id.* at ¶ 58.  On August 27, 2008, Fink was placed in the Inactive National Guard, with the reason for the transfer listed as "Individual's Request."  *Id.* ¶ 60.  Members of the Inactive National Guard do not earn "retirement points" for their service.  *Id.* ¶ 61.  The complaint alleges that, as a result of being placed in the Inactive National Guard, Fink has potentially lost tens, if not hundreds, of thousands of dollars in retirement benefits.  *Id.*  On April 7, 2012, Fink applied to the ABCMR to correct his military record in order to allow him to return to Active service and to finish his remaining three years.  On his form, Fink stated that he was placed in the Inactive National Guard without his knowledge.  His application packet also included his transfer form, which identified the reason for his transfer as "Individual's Request."  *Id.* ¶ 62.  On April 26, 2012, the ABCMR informed Fink, in a letter again signed by Klaus Schumann, that in order for the ABCMR to consider his request for a disability evaluation, he would "need to provide all Army medical treatment records that w[ould] substantiate" his request.  Compl., Ex. B, Letter from Schumann to Fink (April 26, 2012) [hereinafter Fink Letter], ECF No. 1-2.  The letter noted that the ABCMR "cannot process [Fink's] application without the aforementioned documents," stated that Fink could reapply for ABCMR consideration with the necessary documentation, and enclosed a blank application for his convenience.  *Id.*

### 2.    ABCMR

The ABCMR is a board of civilians established within the Office of the Secretary of the Army.  *Id.* ¶ 21.  The ABCMR considers applications filed by soldiers and veterans for correction

of military records.  *Id.*  The ABCMR has the authority to recommend and, in some cases, grant the correction of military records in the case of a material error or an injustice.  *See* 10 U.S.C. § 1552; 32 C.F.R. § 581.3(b)(4)(ii).

### B.    Procedural Background

Plaintiffs have filed a three-count, class-action Complaint.  The First Claim for Relief alleges that the ABCMR violated 5 U.S.C. § 704 of the Administrative Procedure Act (APA).  Compl. ¶¶ 32, 74-80.  It asserts that the members of the Board failed to review Duran's and Fink's applications, and the applications of other similarly situated applicants, and instead delegated that responsibility to ABCMR staff.  *Id.*  According to Plaintiffs, under 10 U.S.C. § 1552 and its implementing regulation, 32 C.F.R. § 581.3, the Board members lacked the authority to effect such a delegation of responsibility.  *Id.* ¶ 78.  Plaintiffs also contend that the Board members' failure to review Duran's and Fink's applications violated the Due Process Clause of the Fifth Amendment of the Constitution.  *Id.* ¶¶ 81-84.

The Second Claim for Relief alleges that the ABCMR committed another violation of Section 704 of the APA by failing to obtain the medical records needed for Duran and Fink, and other similarly situated applicants, to complete their applications for correction.  *Id.* ¶¶ 85-90.  Plaintiffs contend that, under the ABCMR's implementing regulation, the director of an Army records holding agency is supposed to furnish all requested records to the ABCMR to assist it in conducting a full and fair review.  *Id.* ¶ 87.  Plaintiffs further assert that the ABCMR regularly and "as a matter of practice fails to fulfill its duty to request assistance from the director of an Army records holding agency in seeking any records thought lacking from an application for corrections."  *Id.* ¶ 88.

The Third Claim for Relief alleges that the ABCMR violated the APA yet again by failing to publish two internal guidebooks titled "Screening Team Analyst Resource" and a "Handbook for ABCMR Board Members."  *Id.* ¶¶ 91-93.  Plaintiffs contend that the ABCMR was required to publish those guidebooks under the Freedom of Information Act, *see* 5 U.S.C. §§ 552(a)(1), (2).  Compl. ¶ 92.  Plaintiffs also assert that the failure to publish the guidebooks violates the Due Process Clause of the Fifth Amendment.  *Id.* ¶ 98.

## III.    LEGAL STANDARD

Defendants[3] have moved to dismiss this matter on two grounds.  First, they contend that all Plaintiffs lack standing under Federal Rule of Civil Procedure 12(b)(1), and therefore, the court is without subject matter jurisdiction to hear this matter.  *See* Defs.' Mem. in Supp. of Mot. to Dismiss, ECF No. 9 [hereinafter Defs.' Mot.], at 10.   Second, under Rule 12(b)(6), Defendants argue that Plaintiffs have failed to state a claim upon which relief can be granted.  *Id.*

### A.    Motion to Dismiss under Rule 12(b)(1)

On a motion to dismiss for lack of standing brought under Rule 12(b)(1), a federal court must presume that it "lack[s] jurisdiction unless the contrary appears affirmatively from the record."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006) (internal quotation marks omitted).   The burden of establishing the elements of standing "rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  A plaintiff must establish standing "for each claim" and "for each form of relief sought," *DaimlerChrysler*, 547 U.S. at 352 (internal quotation

---

[3] Defendants are the United States Department of Defense; the United States Army; Eric Fanning, Secretary of the Army; the Army Review Boards Agency; the ABCMR; and Sarah Bercaw, Director of the ABCMR.  Compl. ¶¶ 17-22. Eric Fanning, Secretary of the Army, substituted as Defendant for John McHugh, former Secretary of the Army.

marks omitted), "with the manner and degree of evidence required at the successive stages of litigation," *Lujan*, 504 U.S. at 561.

When assessing a motion to dismiss predicated on lack of standing, the court must accept "well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). The court is not required to assume the truth of legal conclusions or accept inferences that are not supported by the facts set out in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007). "Threadbare recitals of the elements of [standing], supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. If a complaint lacks sufficient facts "to state a claim [of standing] that is plausible on its face," the court must dismiss it. *Id*. (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Arpaio*, 797 F.3d at 19. When a court is assessing a Rule 12(b)(1) motion, it has broad discretion to consider materials outside the pleadings if they are competent and relevant. *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 368 (D.D.C. 2012) (citing 5B Charles Wright & Arthur Miller, Federal Practice & Procedure § 1350 (3d ed. 2004))**.**

### B.      Motion to Dismiss under Rule 12(b)(6)

"'A complaint can be dismissed under Rule 12(b)(6) when a plaintiff fails to state a claim upon which relief can be granted.'" *Howard Univ. v. Watkins*, 857 F. Supp. 2d 67, 71 (D.D.C. 2012) (quoting *Peavey v. Holder*, 657 F. Supp. 2d 180, 185 (D.D.C. 2009) (citing Fed. R. Civ. P. 12(b)(6))). Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *See Smith-Thompson v. Dist. of Columbia*, 657 F. Supp. 2d 123, 129 (D.D.C. 2009).

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, acceptable as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged.

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).  "The complaint must be construed in the light most favorable to the plaintiff and 'the court must assume the truth of all well-pleaded allegations.'"  *Watkins*, 857 F. Supp. 2d at 71 (quoting *Warren v. Dist. of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)).

Similar to a court's review of a Rule 12(b)(1) motion, when evaluating a motion to dismiss under Rule 12(b)(6), the court also must accept a plaintiff's "factual allegations . . . as true," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 67 (D.C. Cir. 2015), and "construe the complaint 'in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged.'"  *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979)).  The court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or "inferences . . . unsupported by the facts set out in the complaint," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## IV.   DISCUSSION

### A.   Plaintiffs' Standing

#### 1.      *First and Second Claims for Relief*

##### a.      Duran's and Fink's standing

The court begins with the standing of Plaintiffs Duran and Fink as to their First and Second Claims for Relief.  *See Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) ("[A] plaintiff must demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought.") (citation and internal quotation marks omitted).  After the parties had completed briefing on Defendants' Motion to Dismiss, the court asked them to address whether Duran and Fink had

suffered a "concrete" injury in light of the Supreme Court's decision in *Spokeo v. Robins*, 136 S. Ct. 1540 (2016). *See* Minute Order, May 18, 2016. The parties have taken different positions on that question.

In *Spokeo*, the Court emphasized and expounded upon the essential component of "concreteness" in establishing an injury in fact for purposes of Article III standing. *See Spokeo*, 136 S. Ct. at 1548 (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (setting forth elements of standing, including that the plaintiff must have suffered an injury in fact, and that the injury-in-fact element requires a plaintiff to show a "concrete and particularized" invasion of a legally protected interest)). The Court explained that a concrete injury is one that is "'real,' and not 'abstract[,]'" *id.*, but also made clear that a concrete injury can be intangible, *id.* at 1549. Such intangible harm is not created, however, just because "a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." *Id.* Thus, the Court observed, where a plaintiff contends that he has suffered a violation of a statutorily granted procedural right, he must also show that the procedural violation caused real harm or a risk of real harm—tangible or intangible—in order to successfully establish standing. *Id.* The plaintiff in *Spokeo*, for instance, could not "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Id.*

Applying these principles, the court concludes that Duran and Fink have alleged real harm flowing from the alleged procedural violations that gives them standing to assert their claims. As in *Spokeo*, the injuries complained of by Duran and Fink in their First and Second Claims for Relief arise from alleged procedural violations: (1) the ABCRM Board members failed to review their applications, and (2) the ABCRM failed to obtain their medical records. *See* Pls.' Suppl. Br.

Regarding *Spokeo*, ECF No. 26, at 4 (describing their injuries as violations of "procedural" protections).  But, unlike the plaintiff in *Spokeo*, those procedural violations are accompanied by real harm.  Because of the alleged procedural violations, Duran's and Fink's records remain uncorrected.  *See* Compl. ¶ 79.  Those uncorrected records in turn have caused both Duran and Fink to receive medical and retirement benefits that are inferior to what they would receive with corrected records.  *See id.* ¶ 55 (alleging that, because Duran incorrectly did not receive a medical discharge, he and his family "do not receive the quality and degree of medical care to which he is entitled"); *see id.* ¶ 61 (alleging that Fink's erroneous Inactive National Guard status has precluded him from retiring with full retirement benefits).  Such allegations of real harm, at the motion to dismiss stage, are sufficient to establish standing for a procedural violation.  *See NB ex rel. Peacock v. Dist. of Columbia.*, 682 F.3d 77, 82-83 (D.C. Cir. 2012).

Defendants do not seriously challenge that Duran and Fink have alleged an injury in fact. Instead, they advance a different argument.  They contend, both in their motion to dismiss and in their supplemental briefing, that Duran and Fink lack standing because their injuries are self-inflicted, as both failed to comply with the ABCMR's instruction to attach all relevant Army medical records to their original applications and declined the ABCMR's invitation to resubmit corrected applications.  *See* Defs.' Mot. at 16; Defs.' Suppl. Br. in Supp. of Mot. to Dismiss, ECF No. 25, at 4 (arguing that the "alleged injury is illusory because the only thing preventing Plaintiffs from obtaining the ABCMR review they seek is their own decision not to submit additional medical records").

In other words, Defendants assert that Duran and Fink have not established the "causation" element of standing.  *See Grocery Mfrs. Ass'n v. E.P.A.*, 693 F.3d 169, 189 (D.C. Cir. 2012) ("It is of course true that causation can be defeated by voluntary action—purely self-inflicted injury is

not fairly traceable to the actions of another."). But standing cannot be so easily defeated by the simple assertion that, if the plaintiffs had only complied with the procedure they now challenge, they would not have suffered any procedural or related injury. If that were true, then it is hard to conceive of when, if ever, a procedural-rights injury plaintiff such as Duran and Fink—both of whom are seeking to correct government records—could challenge an agency's persistent failure to comply with a procedural requirement.

If anything, the showing of causation required in a procedural-injury case is more relaxed. "[I]n a procedural-injury case, a plaintiff need not show that better procedures would have led to a different substantive result." *Renal Physicians Ass'n v. Dep't of Health and Human Servs.*, 489 F.3d 1267, 1278 (D.C. Cir. 2007); *see also Ctr. for Law and Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160 (D.C. Cir. 2005) ("To show causation and redressability in their procedural-rights case, Appellants need not demonstrate that, but for the procedural defect, the final outcome of the rulemaking process would have been different[.]"). Rather, "to have standing . . . , the procedure at issue must be one designed to protect a threatened interest of the plaintiff . . . [and] the plaintiff must [ ] show that the agency action was the cause of some redressable injury to the plaintiff." *Renal Physicians*, 489 F.3d at 1278-79.

Here, both requirements are satisfied. The challenged procedures relate to how the ABCMR reviews applications for correction and are designed to protect service members' interests in ensuring that the records of their military service are correct and complete. The two procedural injuries that Duran and Fink claim here—that their applications were not reviewed by ABCMR members and that the ABCMR did not obtain their medical records—would be redressable by a court order that declares both of the challenged practices unlawful. Such a court order would mean that ABCMR Board members would be required to review applications before rejecting them for

insufficient medical evidence and that the ABCMR would be required to obtain the missing documentation, thereby remedying both of Duran's and Fink's claimed procedural injuries. Therefore, Duran and Fink have sufficiently alleged the causation element of standing.

The two main cases upon which Defendants rely—*Huron v. Berry*, 12 F. Supp. 3d 46 (D.D.C. 2013), and *Ellis v. Comm'r of IRS*, 67 F. Supp. 3d 325 (D.D.C. 2014), *aff'd on other grounds* 622 Fed. Appx. 2 (D.C. Cir. 2015)—are inapposite. *See* Defs.' Mot. at 17. Neither case, as here, involved a claim of procedural injury. Rather, in *Huron*, the plaintiff challenged the Office of Personnel Management's approval of certain health plans for federal employees that excluded or limited coverage of medical equipment, known as SGDs, used by communication-impaired persons. *See* 12 F. Supp. 3d at 47. The court found standing lacking due to the absence of causation because the plaintiff "voluntarily chose to enroll and stay enrolled in a plan that specifically excludes SGDs from coverage, despite having the option to select and transfer to a plan that cover[ed] SGDs." *Id.* at 53. In *Ellis*, the plaintiff's claimed injury—the future tax liability he would owe—arose from the IRS' alleged creation of false tax records for citizens who do not pay income tax. *See* 67 F. Supp. 3d at 336. The court expressed "doubt" that the plaintiff could satisfy the causation requirement because it was his decision not to file a return, and not the alleged fraudulent scheme, that ultimately created the additional tax deficiencies that the plaintiff claimed as injury. *Id.* Here, by contrast, Duran's and Fink's claimed procedural injuries arose, not as a result of their own choices, but because of the allegedly improper ways in which the ABCMR

processed their applications.  Unlike in *Huron* and *Ellis*, Duran's and Fink's injuries are not "self-inflicted."

                b.      <u>NVLSP's standing</u>

The court turns next to Defendants' challenge to NVLSP's standing with respect to the First and Second Claims for Relief.  An organization such as NVLSP may assert standing on its own behalf or on behalf of its members.  *See Am. Soc'y for the Prevention of Cruelty to Animals v. Feld Entm't*, 659 F.3d 13, 24 (D.C. Cir. 2011).  Here, NVLSP does the former—it argues that the organization itself has been harmed by the ABCMR's practices.  *See* Pls. Opp'n at 14-16.

Using a theory known as *Havens* standing, an organization can establish Article III standing on its own behalf if it can show that "the defendant's actions cause a 'concrete and demonstrable injury to the organization's activities' that is 'more than simply a setback to the organization's abstract social interests.'"  *Am. Soc'y,* 659 F.3d at 25 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)); *see also Equal Rights Ctr. v. Post Props*., 633 F.3d 1136, 1138 (D.C. Cir. 2011).  Although our Court of Appeals has "applied *Havens Realty . . .* in a wide range of circumstances," *Abigail Alliance for Better Access to Dev. Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006), it also has imposed two key limitations on *Havens* standing, *see Am. Soc'y*, 659 F.3d at 25.

First, an organization "must show a 'direct conflict between the defendant's conduct and the organization's mission.'"  *Id.* (quoting *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996)).  Second, "an organization may not 'manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit.'"  *Id.* (quoting *Spann v. Colonial Vill., Inc*., 899 F.2d 24, 27 (D.C. Cir. 1990)).  The Court of Appeals has imposed these two limitations to distinguish between "organizations that allege that their activities have been

impeded from those that merely allege that their mission has been compromised." *Abigail Alliance*, 469 F.3d at 133.  Accordingly, to determine whether the organization has suffered a concrete and demonstrable injury to its activities, the court asks "whether the [defendant's] action or omission [ ] injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm." *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (internal quotation marks omitted); *see Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).  For the reasons explained below, NVLSP's allegations do not satisfy either inquiry.

"To allege an injury to its interest, 'an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services.'" *Id.* (quoting *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015)).  "An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an 'inhibition of [the organization's] daily operations.'" *Id.* (quoting *PETA*, 797 F.3d at 1094).  Our Court of Appeals has been clear that organizational plaintiffs cannot satisfy this threshold requirement without alleging specific facts indicating how a defendant's actions undermine the organization's ability to perform its fundamental programmatic services.

In similar contexts as the present dispute, advocacy groups have been able to successfully allege an injury to their interests where the challenged actions have foreclosed or restricted the avenues of legal redress, *see PETA*, 797 F.3d at 1095, or the flow of information, *see Abigail Alliance*, 469 F.3d at 133, upon which those groups rely to perform their daily programmatic functions and provide their fundamental services.  Conversely, advocacy groups that fail to allege how the defendant's actions forced the organization to expend additional resources in order to continue to perform their daily programmatic functions, or provide their fundamental services, fail

to establish the necessary injury to their interest.  *See Food & Water Watch*, 808 F.3d at 921.  Here, NVLSP has alleged no more than a mere setback to the organization's abstract interests.  This alone cannot suffice to establish injury.  *See PETA*, 797 F.3d at 1093.

NVLSP's stated mission is to assist the nation's 25 million veterans and active duty personnel to receive the benefits to which they are entitled because of disabilities resulting from military service.  Compl. ¶ 15.  One of its programs, called "Lawyers Service Warriors," connects veterans with lawyers from the private sector who represent the veterans on a *pro bono* basis "on, among other things, applications before the ABCMR."  *Id.* ¶ 16.  The gravamen of NVLSP's claims stem from its mentoring and training of the *pro bono* counsel who appear on behalf of veterans before the ABCRM.  *Id.*  According to NVLSP, it "has devoted and continues to devote scarce resources to investigating what are the unpublished rules, guidelines and practices under which the ABCMR operates in adjudicating applications, including the extent to, and the circumstances under which ABCMR applications are decided by the ABCMR staff, rather than a panel of civilian Board members."  *Id.*  The alleged diversion of even scarce resources, however, does not amount to the kind of "perceptible impairment" of NVLSP's daily operations required to establish organizational injury.  Rather, this is precisely the type of vague pronouncement of generalized injury that our Court of Appeals routinely rejects.

NVLSP nowhere alleges how the ABCMR's use of staff to screen and return incomplete applications affects NVLSP's daily operations, let alone how ABCMR's actions *inhibit* those operations.  *See Food & Water Watch*, 808 F.3d at 921 ("Although Lovera alleges that FWW will spend resources educating its members and the public about [the defendant's actions], nothing in Lovera's declaration indicates that FWW's organizational activities have been perceptibly impaired in any way.").  And even if the court were to assume, for instance, that ABCMR's

allegedly impermissible use of staff to screen applications somehow limits NVLSP's ability to seek redress of its members' injuries through administrative channels, NVLSP's Complaint fails to even attempt to demonstrate how this alleged impairment would, or has already, forced NVSLP to modify its basic programmatic services in any way.  The same is true with respect to ABCMR's refusal to obtain medical records on behalf of applicants.  Accordingly, NVLSP has failed to allege an injury to the organization's interests sufficient to establish that it suffered a concrete and demonstrable harm.  *Cf. PETA*, 797 F.3d at 1093-94 (finding allegations of organizational injury sufficient where the plaintiff claimed that the FDA's determination not to apply the Animal Welfare Act to birds impaired the organization's programmatic functions by foreclosing both the traditional avenues through which the plaintiff filed animal abuse complaints regarding birds and the information stream on which the plaintiff relied to educate the public about such abuse.).

Nor has NVLSP sufficiently alleged that it used its resources to counteract the ABCMR's allegedly improper actions.  "[A]n organization does not suffer injury in fact where it 'expend[s] resources to educate its members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'"  *Food & Water Watch*, 808 F.3d at 920 (quoting *Nat'l Taypayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)).  In its Complaint, NVLSP alleges that it has had to "divert and devote" scarce resources to assist veterans and their counsel who are harmed by the ABCMR's policies and practices.  Compl ¶ 16; *see also* Pls.' Opp'n at 15.  Such an allegation is vague, at best, and is certainly insufficient to establish that the ABCMR's actions caused NVLSP to incur operational costs beyond those normally expended.

Therefore, the court concludes that NVLSP lacks standing with respect to the First and Second Claims for Relief.

### 2.    *Third Claim for Relief*

Turning to the Third Claim for Relief, Defendants have argued that all Plaintiffs lack standing to challenge the ABCMR's failure to publish its internal rules and policies under the Freedom of Information Act (FOIA), 5 U.S.C. §§ 552(a)(1), (2).  Both parties' briefing on this issue has been terse, and it is ultimately misdirected.  *See* Defs.' Mot. at 17; Pls.' Opp'n at 12-13.

At bottom, the injury that Plaintiffs assert in their third claim is the ABCMR's refusal to provide information that otherwise ought to be publicly available.  Compl. ¶¶ 93-94 (complaining that the ABCMR has not made certain rules and policies "public").  The Supreme Court held in *Federal Election Commission v. Akins* that a "plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute."  524 U.S. 11, 21 (1998).  "To establish [informational] injury, a plaintiff must espouse a view of the law under which the defendant (or an entity it regulates) is obligated to disclose certain information that the plaintiff has a right to obtain."  *Am. Soc'y*, 659 F.3d at 23.  *See also Friends of Animals v. Jewell*, No. 15-5070, 2016 WL 3125204, at * 6 (D.C. Cir. June 3, 2016) ("Following *Akins*, this circuit has recognized that 'a denial of access to information can work an 'injury in fact' for standing purposes, at least where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'") (quoting *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002)).

Plaintiffs easily have established injury in fact and thus have standing to assert their third claim.  *See Am. Soc'y, 659 F.3d* at 23 ("For purposes of informational standing, a plaintiff 'is injured-in-fact . . . because he did not get what the statute entitled him to receive.'") (quoting

*Zivotofsky v. Sec'y of State*, 444 F.3d 614, 618 (D.C. Cir. 2006)).  Plaintiffs have alleged that two policy manuals—the "Screening Team Analyst Resource" and an internal Handbook for ABCMR Board members—as well the ABCMR's policy instructing staff to return an application when it is missing documents, are subject to public disclosure under Sections 552(a)(1) and (2) of FOIA. Compl. ¶¶ 93-94.  Those sections of FOIA mandate that, among other things, an agency shall make publicly available, either through publication in the Federal Register or for public inspection and copying, "rules of procedure," "statements of general policy," and "administrative staff manuals and instructions to staff that affect a member of the public."  5 U.S.C. §§ 552(a)(1)(C), (D); *id.* § 552(a)(2)(C).  Thus, Plaintiffs have sufficiently alleged that, at least on their reading of FOIA, the ABCMR should have made publicly available the two policy manuals and the policy concerning incomplete applications.  Accordingly, the court finds that NVSLP and the individual plaintiffs have standing to assert their Third Claim for Relief.

**B.**      **Plaintiffs' Failure to State a Claim**

*1.      First Claim for Relief*

Having resolved the questions as to Plaintiffs' standing, the court next addresses whether Plaintiffs have stated claims for which relief can be granted under the APA, starting with their First Claim for Relief.[4]  Under that claim, Plaintiffs assert that the ABCMR unlawfully authorizes the ABCMR staff, in violation of both 10 U.S.C. § 1552 and its implementing regulation, 32 C.F.R. § 581.3, to review and return applications to applicants due to their incompleteness.

---

[4] Although the propriety of an agency action under the APA is ordinarily decided on a motion for summary judgment, because "the legal questions raised by a 12(b)(6) and a motion for summary judgment are the same," the court will proceed to consider the merits of the parties' respective positions on Defendants' motion to dismiss. *Marhsall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222-23 (D.C. Cir. 1993).  Additionally, the parties dispute whether the acts and omissions at issue are "final agency action," as required to bring a claim under the APA. *See* 5 U.S.C. § 704. Because that requirement is not jurisdictional, but is instead an essential element of an APA claim, *see Trudeau v. FTC*, 456 F.3d 178, 184-85 (D.C. Cir. 2006), the court declines to address that issue at this time.

Compl. ¶ 78.  That function, according to Plaintiffs, must be carried out by Board members, and Board members alone.  *Id.* ¶ 79.

        a.      <u>Section 1552</u>

The court turns first to the question of whether the ABCMR's practice of allowing staff to review and return incomplete applications violates Section 1552.  Ordinarily, the court would defer to an agency's interpretation of a statute that it implements as set forth by *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Bullcreek v. Nuclear Regulatory Comm'n*, 359 F.3d 536, 540-41 (D.C. Cir. 2004).  Our Court of Appeals, however, has cautioned that such deference may be inappropriate where, as here, more than one agency implements the same statute.  *See id.* at 541; *see also Sherley v. Sebelius*, 689 F.3d 776, 786 (D.C. Cir. 2012); *Lipsman v. Sec'y of Army*, 257 F. Supp. 2d 3, 8 (D.D.C. 2002) (declining to grant deference under *Chevron* to the Secretary of the Army because the "text of section 1552(a)(1) demonstrates that the statute applies not just to the Army, but to all branches of the military").  The court need not decide whether *Chevron* deference applies here, because the result is the same even under *de novo* review.  *See Bullcreek*, 359 F.3d at 541 (declining to decide whether to afford *Chevron* deference where "the result is the same" under even *de novo* review).

The court begins, as it must, with the text of the controlling statute.  *See Chevron*, 467 U.S. at 843 n.9 (1984) ("The judiciary . . . must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.") (citations omitted); *Carter v. United States*, 530 U.S. 255, 271 (2000) ("In analyzing a statute, we begin by examining the text.").  Section 1552 provides that the Secretary of a military department "acting through boards of civilians of the executive part of that

military department" "may correct any military records . . . when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1). Plaintiffs read the text "acting through boards of civilians" as only permitting the ABCMR's civilian Board members, and not its staff, to review and return applications for incompleteness. Pls.' Opp'n at 17-18.

But their reading is flawed in two respects. First, the statute makes clear that only "corrections"—and, relatedly, decisions not to correct—"shall be made by the Secretary acting through boards of civilians." 10 U.S.C. § 1552(a)(1). The act of reviewing and returning an application for incompleteness is not, however, an act of "correction" or a refusal to correct. It is simply a procedural determination antecedent to the Board's review function. Nothing in Section 1552 requires that such antecedent procedural questions be considered only by a Board member.

Second, Plaintiffs' reading is flawed because it ignores another part of Section 1552, which provides that "[c]orrections under this section shall be made under procedures established by the Secretary concerned." 10 U.S.C. § 1552(a)(3). That section plainly vests in the Secretary wide discretion as to the procedures that apply to the records corrections process. Plaintiffs' reading, on the other hand, if accepted, would tie the Secretary's hands with respect to evaluating applications for completeness and, arguably, for compliance with other procedural prerequisites to Board review. According to Plaintiffs, all such decisions would have to be channeled through the Board itself. Such a reading cannot be squared with the discretion that Congress granted the Secretary to establish rules of procedure for the records correction process.

Plaintiffs insist that their reading of Section 1552 is compelled by *Lipsman v. Secretary of Army*, 335 F. Supp. 2d 48 (D.D.C. 2004), a case in which the court held that Section 1552 did not permit ABCMR staff to evaluate applications for reconsideration of Board correction decisions. *See* Pls.' Opp'n at 17-18. But *Lipsman* does not help Plaintiffs. If anything, it undermines their

position.  At issue in *Lipsman* was an ABCMR regulation that authorized the ABCMR staff to review certain categories of requests for reconsideration and to return such requests without action if the request did not meet defined criteria.  335 F. Supp. 2d at 50-51.  The court in *Lipsman* rejected such a delegation of authority to the staff, holding that under a plain reading of Section 1552, corrections decisions must be made "through boards of civilians."  *Id.* at 53-54.

In reaching that conclusion, and importantly for present purposes, the court distinguished between procedural rules, which the staff could enforce, and substantive corrections decisions, which only the Board itself could make.  The court wrote:  "If [the regulation] were merely a procedural rule, ABCMR's actions would be permissible, because it would simply be following its own discretionary procedure.  Yet despite the defendants' insistence to the contrary, [the regulation] is not merely a procedural guideline, but rather a substantive one."  *Id.* at 54-55.  The court added: "[T]he plaintiffs here question an amendment which calls on the staff to make substantive judgments on the sufficiency of the submitted evidence.  There is a significant distinction between authorizing staff members to determine if new evidence is present at all and authorizing staff members to assess the relevance and merit of that new evidence."  *Id.* at 55 (internal citations omitted).

Here, the ABCMR staff did no more than review Duran's and Fink's applications, determine that the documentation submitted was insufficient or lacking, and return them. *See* Compl. ¶¶ 36, 54, 63, Duran Letter, Fink Letter.  The staff did not, even by Duran's and Fink's statement of the facts, make a substantive judgment as to whether either man was entitled, or not, to a records correction.  Under *Lipsman*, entrusting staff with the responsibility of making an initial evaluation about an application's completeness, before it is presented to the Board, does not contravene Section 1552.

21

b.      32 C.F.R. § 581.3

Plaintiffs also argue that the ABCMR's practice of allowing staff to review and return applications based on their incompleteness runs afoul of 32 C.F.R. § 581.3, which sets forth the ABCMR's "policies and procedures for correction of military records."   *Id.* § 581.3(a)(1). *See* Pls.' Opp'n at 18-21.  The court disagrees.

An agency's interpretation of its own regulation, if the regulation is ambiguous, is entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997).  *See Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).[5]  The court must accept the agency's interpretation unless it is "plainly erroneous or inconsistent with the regulations or there is any other reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question." *Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 59 (2011) (internal quotation marks, citations, and alteration omitted).  Here, the ABCMR's interpretation is neither plainly erroneous nor is it inconsistent with its own regulations.  Nor is there any reason to suspect that the interpretation does not reflect the agency's considered judgment.

Although the regulation itself does not explicitly address whether the ABCMR staff may review and return an application because it lacks the sufficient medical documentation, it can reasonably be read to vest the staff with such authority.  The regulation states repeatedly that the Board and its members will consider only those applications that are "properly" before it. 32 C.F.R. §§ 581.3(b)(4)(i) (stating that ABCMR members will review "all applications that are properly before them"), 581.3(c)(2)(i) ("The ABCMR considers individual applications that are properly brought before it."), 581.3(e)(3)(i) (stating that a panel of "at least three ABCMR

---

[5] Plaintiffs urge the court not to afford *Auer* deference because they contend that the statute itself—Section 1552— unambiguously prevents staff from reviewing and returning applications based on their incompleteness.  *See* Pls.' Opp'n at 20.  Having rejected that argument, *supra*, the court must afford deference to the ABCMR's interpretation of its own regulation under *Auer*.

members will consider each application that is properly brought before it"). The qualifier "properly" must mean that some applications are "not proper" and therefore are not suitable for Board consideration.

As to who decides whether an application is "proper" for Board consideration, the regulations appear to place that responsibility with the staff of the Board. The regulations provide that "[t]he ABCMR staff will review each application to determine if it meets the criteria for consideration by the ABCMR." *Id.* § 581.3(e)(1). The regulations do not, however, spell out what those "criteria" might be. Instead, they provide that an "application may be returned without action if," among other reasons, "[t]he applicant fails to complete and sign the application." *Id.* § 581.3(e)(1)(i). What constitutes a "complete" application is not defined, however.

In their motion to dismiss, Defendants say that they consider an application to be "incomplete" "when an applicant seeks a correction of his military record based on his medical condition, but fails to attach all the relevant medical records as instructed[.]" Defs.' Mot. at 20-21. That interpretation is neither plainly erroneous nor inconsistent with the regulation. When read as a whole, the regulation allocates substantive responsibilities to the Board, but procedural responsibilities to the staff. Thus, the Board is responsible for reviewing each application properly before it and determining "[w]hether the preponderance of the evidence shows that an error or injustice exists," "[w]hether to authorize a hearing," and "whether to deny [an application] based on untimeliness or to waive the statute in the interest of justice." 32 C.F.R. § 581.3(e)(3)(iii). The staff, on the other hand, is tasked with reviewing "each application to determine if it meets the criteria for consideration by the ABCMR." *Id.* § 581.3(e)(1). It can return an application if, in addition to being incomplete and unsigned, "the applicant has not exhausted all other administrative remedies," "the ABCMR does not have jurisdiction to grant the requested relief,"

and "no new evidence was submitted with a request for reconsideration." *Id.* § 581.3(e)(1)(ii)-(iv).  In light of this division of labor, which gives discretion to the staff as to matters of procedure but vests in the Board authority as to matters requiring substantive decision-making, the court cannot conclude that Defendants' interpretation of its own regulations is in error.  Accordingly, the court concludes that Duran and Fink have not stated a claim that the ABCMR staff's review and return of their applications for insufficient medical records violated the APA.

## 2.    *Second Claim for Relief*

As to their Second Claim for Relief, Duran and Fink assert that Defendants violated the APA because they refused to obtain the medical records needed to complete their applications. Plaintiffs' challenge arises solely under 32 C.F.R. § 581.3 and not Section 1552.  Compl. ¶¶ 86-88.  Specifically, Plaintiffs assert that the "plain language" of 32 C.F.R. §§ 581.3(b)(5)(ii) and (iii) imposes a duty on the ABCMR to obtain the medical records needed to complete an application. Pls.' Opp'n at 24-25.  The court disagrees and concludes the pertinent regulations impose no such duty.

Section 581.3(b)(5), on which Plaintiffs rely, sets forth the "[r]esponsibilities" not of the "ABCMR members," *see id.* § 581.3(b)(4), but of the "director of an Army records holding agency," *id.* § 581.3(b)(5).  In subsections (ii) and (iii), it states that the "director of an Army records holding agency will" "[f]urnish all requested Army military records to the ABCMR," *id.* § 581.3(b)(5)(ii), and "[r]equest additional information from the applicant, if needed, to assist the ABCMR in conducting a full and fair review of the matter," *id.* § 581.3(b)(5)(iii).  Once again, the court owes deference under *Auer* to Defendants' reading of these provisions.  *See Christensen*, 529 U.S. at 588.

Contrary to what Plaintiffs claim, *see* Pls.' Opp'n at 24-25, neither the plain text nor the structure of the regulation place a duty on the ABCMR to obtain documents to complete an application.  For starters, the duty to "furnish" records or "request" additional information rests on the "director of Army records," not the "ABCMR members."  32 C.F.R. § 581.3(b)(5).  That text and structure establishes a sensible procedure—if the ABCMR wishes to request additional documents, it can instruct the director of an Army records holding agency either to "furnish" them or "request" them from the applicant.  But nothing in the regulations *compels* the ABCMR to make that request in the first place.  Indeed, the opposite is true, as the regulations provide that the ABCMR "may, in its discretion . . . request additional evidence or opinions."  *Id.* § 581.3(c)(2)(iii).

Plaintiffs argue that this reading of the regulation is untenable because it would read 32 C.F.R. § 581(b)(5)(ii) "out of existence."  Pls.' Opp'n at 25.  But the interpretation does no such thing.  An Army records holding agency's duty to "furnish" records is triggered when the ABCMR asks for them.  When and in what circumstances the ABCMR makes such a request is up to the ABCMR.  That construction of the regulation does not read the role of the Army records holding agency out of existence.  It only makes the holding agency's duty contingent upon a request.

Plaintiffs also have cited to an instruction in the ABCMR's Applicant's Guide that they contend supports their reading of the regulation.  Pls.' Opp'n at 24 (citing the ABCMR's Applicant's Guide, which states "[y]ou do not need to obtain a copy of your military records from the [National Personnel Records Center] to apply to the ABCMR").  While this statement arguably creates some confusion about whether the ABCMR will obtain medical records, it cannot supplant the regulations or the agency's reasonable construction of them.  Therefore, the court concludes that Duran and Fink's assertion that the ABCMR failed in its duty to obtain their medical records does not state a claim for relief under the APA.

3.      *Third Claim for Relief*

As to their final claim for relief, Plaintiffs allege that the ABCMR violated the APA by failing to make public, as required under FOIA, the "Screening Team Analyst Resource" and a "Handbook for ABCMR Board Members."  Compl. ¶¶ 91-93.  They also assert that the ABCMR was required by FOIA to publish its policy permitting staff members to review and return applications that are deemed incomplete.  *Id.* ¶ 94.  Neither of these contentions supports a claim under the APA.

Plaintiffs first allege that the "Screening Team Analyst Resource" and the "Handbook for ABCMR Board Members" must be made public under 5 U.S.C. § 552(a)(2)(C).  Pls.' Opp'n at 28 (citing Compl. ¶ 93).  Section 552(a)(2)(C) provides that "[e]ach agency, in accordance with published rules, shall make available for public inspection and copying administrative staff manuals and instructions to staff that affect a members of the public."  Although Plaintiffs may be correct that Section 552(a)(2)(C) requires that the handbooks in question be made publicly available, Plaintiffs have brought their claim under the wrong statute—the APA—and should have instead brought their claim under FOIA.

This court addressed this very issue in *Citizens for Responsibility and Ethics in Washington (CREW) v. DOJ*, No. 13-cv-01291, 2016 WL 912167 (D.D.C. Mar. 7, 2016).  In *CREW*, the question presented was "whether a suit alleging that an agency has violated Section 552(a)(2) must be brought under FOIA, and FOIA alone, or whether such a claim can be advanced under the APA."  *Id.* at *1.  The court held that FOIA provides "an adequate remedy" to enforce the requirements of Section 552(a)(2) of FOIA and therefore "preclud[es] review under the APA."  *See id.* at *8.  For the reasons explained in *CREW*, which the court will not repeat here, Plaintiffs should have brought their claim to enforce publication under Section 552(a)(2) under FOIA, after

making a specific demand to the ABCMR to make such publication, and not under the APA.  *See id.* at *7-8.

The remaining aspect of Plaintiffs' lack-of-publication claim cannot, however, be resolved on the same basis.  Plaintiffs assert that Defendants also violated FOIA by failing to make public, this time under Section 552(a)(1), "the policies and procedures under which the staff was permitted to return applications."  Pls.' Opp'n at 27.  Section 552(a)(1) of FOIA requires that federal agencies "separately state and currently publish in the Federal Register" certain kinds of information enumerated "for the guidance of the public."  5 U.S.C. § 522(a)(1).  Specifically, Plaintiffs assert that the failure to publish in this case violated Sections 552(a)(1)(C) and (D), which require agencies to publish in the Federal Register "rules of procedure" and "substantive rules of general applicability adopted as authorized by law," respectively.  Our Court of Appeals has held that FOIA does not provide a remedy for a violation of Section 522(a)(1) and has left open the question whether such a claim can be brought under the APA.  *See Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1203 (D.C. Cir. 1996).

For present purposes, the court will assume that Plaintiffs can assert their failure-to-publish claim under Section 552(a)(1) under the APA.  Such a claim, however, requires a litigant to make two showings.  First, "to make out a claim under [§ 552(a)(1)], a litigant must demonstrate that it . . . did not have actual notice of the content" of the policy at issue.  *Texas Alliance for Home Care Servs. v. Sebelius*, 811 F. Supp. 2d 76, 103 (D.D.C. 2011), *aff'd*, 681 F.3d 402 (D.C. Cir. 2012) (internal quotations and citation omitted).  Second, the plaintiff "must show that he was adversely affected by a lack of publication or that he would have been able to pursue an alternative course of conduct had the information been published."  *Alliance for Cannabis Therapeutics v. DEA*,

15 F.3d 1131, 1136 (D.C. Cir. 1994) (internal quotations and citation omitted). Plaintiffs' Complaint falls short on both of these requirements.

As to the first requirement, Plaintiffs have not alleged that they did not have actual notice that the ABCMR staff, instead of its members, were reviewing and returning applications due to incomplete medical records. Indeed, neither Duran nor Fink have made such an allegation. *See* Compl. ¶¶ 39-55, 56-63. Nor has NVLSP. NVLSP does not allege, for instance, that it learned for the first time in connection with Duran's and Fink's applications that it is ABCMR staff who review and return applications because they lack supporting medical records. And, it strikes the court as implausible that NVLSP could make such an allegation, given that, since 2007, it has educated and mentored lawyers who represent records-corrections applicants and who would have very likely encountered this issue during the course of their representation. *Id.* ¶ 16.

Moreover, Defendants cite to various instructions that arguably should have put Plaintiffs on notice that an application lacking sufficient medical records might be returned without receiving Board review. *See* Defs.' Mot. at 5-6 (citing to application Item 9 which states "If military documents or medical records are pertinent to your case, please send copies," and the ABCMR webpage, which states that "[t]he board does not have access to the applicant's health record[s] . . . [and] the applicant must provide it"). *See Texas Alliance for Home Care Servs.*, 811 F. Supp. 2d at 104 (rejecting allegation that the plaintiffs lacked actual knowledge where publicly available information, including the agency's website, was to the contrary). Plaintiffs therefore have not alleged sufficient facts from which the court can infer that they did not have actual notice of the practice that they now challenge.

Additionally, no Plaintiff has sufficiently alleged that it was adversely affected by the ABCMR's failure to publish in the Federal Register. The only harm that NVLSP alleges is that it

has had to divert scarce resources to investigate ABCMR's practices. Compl. ¶ 16. Such inchoate

harm, however, is not enough to be actionable. *See Alliance for Cannabis Therapeutics*, 15 F.3d

at 1136 (rejecting claim of adverse effect where "we have no reason to believe that petitioners

would have pursued an 'alternative course of conduct' had the test been published earlier"); *Texas*

*Alliance for Home Care Servs.*, 811 F. Supp. 2d at 104 (rejecting allegation of adverse effect where

plaintiff "allege[d] no injury or loss under the statue as a result of the lack of information"). The

same conclusion pertains to Duran and Fink. Neither has alleged how their applications would

have been different had they known that the ABCMR staff, instead of the Board, were responsible

for reviewing and returning applications that lacked sufficient medical records. Indeed, it is not at

all clear why the identity of their application reviewers would have at all mattered in what they

submitted or how they submitted it. The court, therefore, concludes that Plaintiffs have failed to

state a claim for which relief can be granted in their Third Claim for Relief.

### 4. *Due Process Claims*

Within each of their three claims for relief, Plaintiffs also have asserted a related procedural

due process claim under the Fifth Amendment. *See* Compl. ¶¶ 81-84, 90, 98. To the extent those

are separate claims, the court dismisses them as well. For the reasons already explained, Plaintiff

received all the process which they were due. *See Does v. Dist. of Columbia*, 93 F.3d 861, 870

(D.C. Cir. 1996) ("A procedural due process claim requires the plaintiff to identify the process that

is due.").

* * *

Although the court has concluded that Plaintiffs' claims must be dismissed, the court urges

the ABCMR to, at a minimum, revisit its application instructions and related guidance to provide

greater transparency to veterans and service members about the records-corrections process. The

application's instructions and related guidance, as found on the ABCMR website and in the Applicant's Guide, are far from a model of clarity.   They are seemingly inconsistent and understandably sow confusion.   *Compare* Pls.' Opp'n  at 24 (citing the ABCMR's Applicant's Guide, which states "[y]ou do not need to obtain a copy of your military records from the [National Personnel Records Center] to apply to the ABCMR") and Compl. ¶ 37 (application seeks information concerning the regional office and claim number if "Veterans Affairs records are pertinent") *with* Defs.' Mot. at 5-6 (citing to application Item 9 which states "If military documents or medical records are pertinent to your case, please send copies," and the ABCMR webpage, which states that "[t]he board does not have access to the applicant's health record[s] . . . [and] the applicant must provide it").   Our country's Army veterans and service members deserve no less than clear and concise instructions about how to complete an application to correct their military records.

## IV.    CONCLUSION

For the foregoing reasons, the Complaint and this matter shall be dismissed in its entirety. A separate order accompanies this Memorandum Opinion.


Dated:  August 19, 2016              Amit P. Mehta
                                     United States District Judge